**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DANYELL N. STEWART, | CASE NO. 4:24-CV-00302 |
| Plaintiff, | |
| vs. | CHIEF DISTRICT JUDGE SARAH LIOI |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff Danyell N. Stewart ("Plaintiff" or "Ms. Stewart") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider the entire medical record and provide a clear, accurate, and well-reasoned explanation to support his findings regarding the persuasiveness of all medical opinion evidence, including the medical opinion of consultative psychological examiner Kenneth Gruenfeld, Psy.D.

1

## I.      Procedural History

Ms. Stewart filed her SSI and DIB applications on September 30, 2021.  (Tr. 59-60.)  She
asserted disability due to blind or low vision, hidradenitis suppurativa, unspecified bipolar
disorder, phobic anxiety disorder, diabetes type 2, vitamin D deficiency, hypertension,
posttraumatic stress disorder ("PTSD"), acquired absence of kidney, degenerative disc disorder,
and "right kidney removed."  (Tr. 61, 72.)  Her application was denied at the initial level (Tr. 59-
60) and upon reconsideration (Tr. 83-84).  She then requested a hearing.  (Tr. 138.)

## II.     Evidence

Although the ALJ identified several severe physical and mental impairments (Tr. 17),
Ms. Stewart bases her appeal solely on a medical opinion regarding her mental impairments
(ECF Doc. 12, p. 10).  The evidence summarized herein is accordingly limited to that which
relates to Ms. Stewart's mental health symptoms and treatment.

## A.     Personal, Educational, and Vocational Evidence

Plaintiff was 42 years old on her alleged onset date.  (Tr. 61.)  She has a high school
education and reports past work as an assistant manager, baker, cashier, and manager in training.
(Tr. 248-49.)  She has not engaged in substantial gainful activity since May 7, 2021, the alleged
onset date.  (Tr. 16.)

## B.     Medical Evidence

### 1.      Relevant Treatment History

Ms. Stewart underwent an initial psychiatric evaluation with Comprehensive Behavioral
Health Associates ("Comprehensive Behavioral Health") via telehealth on May 13, 2020,
reporting that she was having a lot of anger and irritability and was not stable on her current
medications; her medications were increased, including Xanax and Vraylar.  (Tr. 653-56.)  She

was diagnosed with bipolar unspecified and phobic anxiety disorder. (Tr. 655.) Thereafter, she attended a diagnostic assessment update in May 2020 and attended monthly medication management visits from June 2020 through January 2021.[1] (Tr. 657-62, 675-706.)

Ms. Stewart presented to Premier Family Medical Clinic on February 3, 2021, for follow up regarding a recent gunshot wound. (Tr. 496-97.) She had been shot in her left upper thigh the prior week when leaving her home. (Tr. 496.) She reported recent family stress and conflict with her son, and believed her son was responsible for her being shot. (*Id.*) She did not go to the hospital when she was shot, instead removing the bullet herself, but complained of bruising and pain at the wound site. (*Id.*) She also reported increased anxiety and panic attacks since the incident. (*Id.*) Nikki Stephens, NP, administered a Toradol injection and advised Ms. Stewart to continue her current treatment and therapy with Comprehensive Behavioral Health. (Tr. 497.)

At her next psychiatric medication management appointment, on February 4, 2021, Ms. Stewart reported she had been scared to do anything since she was shot in the leg. (Tr. 707.) She was taking her psychiatric medications, including daily Xanax, but the Xanax did not help. (*Id.*) She was alert and oriented but had tangential thought processes and an increased rate and volume of speech; she was tearful and anxious throughout the encounter. (*Id.*) Kassandra Kornbau, DNP, APRN, FNP, decreased her Xanax prescription and instructed her to continue to see her therapist and to return in two weeks or sooner if needed. (*Id.*)

At her telehealth medication management appointment on March 29, 2021, Ms. Stewart was alert and oriented, but her speech was at an increased rate and volume, and she was very anxious. (Tr. 708.) Her diagnoses included: other and unspecified bipolar disorders; phobic anxiety disorder, unspecified; and PTSD. (*Id.*) She had been unable to tolerate the reduction in

---

[1] Ms. Stewart's treatment prior to her gunshot wound in February 2021 is discussed more summarily herein, given her alleged onset date of May 7, 2021.

Xanax due to severe anxiety.  (*Id.*) At her telehealth medication management visit on April 30,

2021, she complained of worsening nightmares but improving anxiety since the prior month.

(Tr. 709.)  She was alert and oriented, with normal speech, and presented as pleasant but

anxious.  (*Id.*)  DNP Kornbau added Prazosin for nightmares, kept Vraylar and Celexa the same,

and decreased Xanax.  (*Id.*)

Ms. Stewart next attended an in-person medication management appointment on June 10,

2021, seeing Diana Isaacs, APRN.  (Tr. 710-19.)  She complained of frequent mood swings,

cycling through anger and sadness multiple times per day, continued depression, high levels of

anxiety, frequent night terrors, multiple panic attacks, and difficulty sleeping.  (Tr. 710.)  Her

mental status examination findings were normal, with a labile mood, appropriate affect and

speech, intact thought processes, normal memory, and normal attention span and concentration.

(Tr. 714.)  Her diagnoses included unspecified bipolar disorder, unspecified phobic anxiety

disorder, and PTSD.  (Tr. 717.)  She was advised to continue her medications, including Xanax,

citalopram, prazosin, and Vraylar (*see* Tr. 656) and to start Rexulti (Tr. 718).

Ms. Stewart returned to see APRN Isaacs for medication management on July 8, 2021.

(Tr. 723-32.)  She was tearful in the office and reported situational stressors involving her

physical health and her son being in a behavioral facility for severe anger and ODD.  (Tr. 731.)

She rated her depression and anxiety as 10/10 and said she experienced hallucinations when

stressed.  (Tr. 723.)  Specifically, she reported seeing nonexistent mice and smelling men's

cologne and cigars when stressed.  (*Id*.)  She also reported thinking about suicide "all the time"

but denied suicidal plans.  (*Id*.)  She reported her first EMDR treatment the prior week, saying

that it really helped her.  (*Id*.)  Upon examination, Ms. Stewart was fully oriented, her memory,

attention, and concentration were all within normal limits, and her affect was appropriate; her

4

mood was depressed and anxious.  (Tr. 727.)  APRN Isaacs provided samples of Rexulti and instructed Ms. Stewart to follow up in two weeks.  (Tr. 731.)

At a follow-up appointment via telehealth on July 22, 2021, Ms. Stewart reported that her medications were effective but her situational stress "overwhelming."  (Tr. 733.)  She had noticed some positive changes since starting Rexulti and reported that her depression and anxiety were well managed.  (*Id.*)  She denied hallucinations or delusions.  (*Id.*)  She was instructed to continue her medications as prescribed and return in two weeks for reevaluation.  (*Id.*)

Ms. Stewart attended an in-office medication management appointment with APRN Isaacs on August 5, 2021.  (Tr. 663-64.)  She complained of situational stressors that included her son being in a behavioral facility since January 2021 and traumatic stress after being shot at her own home in January 2021 by someone who was "out to shoot her son."  (Tr. 663.)  She admitted some anger, but felt she controlled it well, and denied oppositional or impulsive behaviors.  (*Id.*)  She reported hearing voices, including her mother's voice, and said she had been hallucinating mice for over ten years.  (*Id.*)  On examination, she was alert, oriented, pleasant, and cooperative, and demonstrated "fairly logical" thought processes with congruent moods and no cognitive impairment noted, but her affect was tearful.  (*Id.*)  APRN Isaacs increased Ms. Stewart's Rexulti prescription and advised her to return in four weeks.  (*Id.*)

On September 27, 2021, Ms. Stewart underwent a diagnostic re-assessment with Jennifer Culp, LPCC-S, via telehealth.  (Tr. 665-74.)  She reported depression, anxiety, anger, mood swings, inattention, hyperactivity, panic attacks, and traumatic stress from abuse.  (Tr. 669.)  Her mood was good, her affect was appropriate and stable, her behavior was cooperative, pleasant, and calm, and she did not exhibit impaired cognition.  (Tr. 670.)  She did not report

hallucinations or delusions but reported daily fleeting suicidal thoughts. (*Id.*)  LPCC Culp recommended that she continue with counseling, CPST, and medical services. (Tr. 673.)

At an October 24, 2021 medication management appointment via telehealth, Ms. Stewart complained of feelings of anxiety and worthlessness. (Tr. 736.)  She was in a new home, and reported excitement, stress, and increased fear since her son returned home. (*Id.*)  Although she was taking all her medications, she still had breakthrough anxiety. (*Id.*)  She had continued nightmares that were bothersome but did not want to make medication changes. (*Id.*)  She was alert and oriented, with loose thought processes. (*Id.*)  Her speech was increased at the beginning of the encounter due to anxiety, but she was later able to slow down. (*Id.*)  She could not tolerate the reduction in her Xanax due to extreme anxiety. (*Id.*)

At her November 19, 2021 telehealth medication management appointment, Ms. Stewart complained of very high anxiety despite taking her medication every day and taking Xanax frequently. (Tr. 737.)  Her mental status findings were unremarkable, but she reported intermittent movements to her hand and neck. (*Id.*)  DNP Kornbau continued Ms. Stewart's medications but noted that she was on two antipsychotic medications and encouraged her to talk with her primary care provider about the possible side effects she had noted. (*Id.*)

At her telehealth medication management appointment on December 17, 2021, Ms. Stewart complained of increased depression, due to the holidays and recent deaths, and continued high anxiety. (Tr. 739.)  She was taking Xanax daily with some relief. (*Id.*)  She was alert, oriented, pleasant, and cooperative, with logical thought processes, but she spoke at an increased rate and volume. (*Id.*)  No medication changes were made because much of her struggles were situational. (*Id.*)  She was unable to tolerate a reduction in benzodiazepine. (*Id.*)

Ms. Stewart continued attending monthly medication management appointments at Comprehensive Behavioral Health throughout 2022. (Tr. 741-54, 899-967.) At her telehealth appointment with DNP Kornbau on January 14, 2022, she complained of high anxiety and depression that was "up and down." (Tr. 741.) Her mental status findings were unremarkable, and DNP Kornbau made no medication changes. (*Id.*)

Ms. Stewart next attended an in-person appointment with Loren Louk, CNP, on February 10, 2022, where she reported that her symptoms were the same with no changes, but she always had anxiety. (Tr. 743-52.) She was tearful at times and wanted to talk to her regular provider regarding her anxiety. (Tr. 747.) Her mental status findings were unremarkable, except that her mood was anxious. (Tr. 746-48.) CNP Louk continued her prescriptions. (Tr. 750-51.)

Ms. Stewart returned to DNP Kornbau for medication management on March 11, 2022. (Tr. 753-54.) She reported high anxiety despite taking Xanax "around the clock" and feeling overwhelmed and hopeless; she denied suicidal thoughts. (Tr. 753.) On examination, she was tearful, exhibited a loose thought process, and spoke at an increased rate and volume, but was fully oriented. (*Id*.) DNP Kornbau kept Ms. Stewart's medications the same "despite ongoing situational issues" but noted she was unable to tolerate a reduction in Xanax. (*Id.*)

At her next medication management appointment on April 9, 2022, Ms. Stewart continued to report high anxiety, feeling overwhelmed and hopeless, and having a hard time controlling her emotions. (Tr. 966.) She was taking Xanax as prescribed, but it was not working as well as she hoped. (*Id.*) Her mental status findings were similar, with tearfulness, loose thought processes, and speech at an increased rate and volume; she also required redirection several times. (*Id.*) DNP Kornbau maintained her medications without changes. (*Id.*)

Ms. Stewart next attended medication management via telehealth with Doreen Allison, CNP, on June 7, 2022.  (Tr. 957-65.)  She reported that she had been very emotional due to her sons' graduations from eighth grade and high school.  (Tr. 957).  She described situational anxiety and daily anxiety attacks, reporting that Xanax helped with anxiety.  (*Id.*)  She also reported increased depression but said her mood had been stable and "pretty calm."  (*Id.*)  On examination, she was fully oriented with normal speech, intact memory, euthymic mood, and logical thought processes.  (Tr. 961.)  CNP Allison made no medication changes, noting Ms. Stewart was doing well on Vraylar, Rexulti, prazosin, citalopram, and Xanax.  (Tr. 965).

Ms. Stewart returned for a telehealth medication management appointment with CNP Louk on July 8, 2022.  (Tr. 948-56.)  She rated her depression at 8/10, due in part to situational stressors.  (Tr. 948.)  She denied thoughts of self-harm but reported her anxiety was "quite severe due to altercations with her neighbor."  (*Id.*)  She was fully oriented on examination, with normal memory and concentration and an appropriate affect; but her mood was anxious and depressed. (Tr. 952.)  Her diagnoses included phobic anxiety disorder and PTSD.  (Tr. 955.)  Noting that Vraylar and Rexulti are duplicate therapies, CNP Louk adjusted Ms. Stewart's medications to wean her off Rexulti and begin a regime of bupropion.  (*Id.*)

Ms. Stewart's next medication management appointment was on August 1, 2022, with Pradeep Manudhane, MD.  (Tr. 938-47.)  She reported being more anxious and irritable since starting on Wellbutrin (bupropion); she had high anxiety that caused her to wake up shaking and crying.  (Tr. 938.)  She had weaned off Rexulti but had not started the Vraylar back up because of a concern for vomiting episodes.  (*Id.*)  She also reported feeling like she was going to have a panic attack, which turned into anger.  (*Id.*)  She was fully oriented, with normal memory and concentration, appropriate speech, and an appropriate affect; but her mood was anxious.  (Tr.

938, 942.) Dr. Manudhane continued Xanax, citalopram, and prazosin, discontinued Rexulti and Wellbutrin, and restarted Latuda; Ms. Stewart was to follow up in four weeks. (Tr. 946.)

Ms. Stewart attended medication management with APRN Isaacs via telehealth on September 2, 2022, refusing Zoom or Facetime. (Tr. 928-37.) She described her mood as angry but denied depression or mood swings. (Tr. 928.) She said her anxiety was 10/10 and she was having daily panic attacks; she had used her last dose of Xanax the previous day. (*Id.*) On examination, she was fully oriented with appropriate speech, intact thought processes and memory, good attention and concentration, and an appropriate affect; her mood was agitated. (Tr. 932). No changes were made to her medication regimen. (Tr. 936.)

Ms. Stewart underwent a telephonic psychiatric diagnostic assessment with Diane Oliver, RN, co-signed by DNP Kornbau, on October 7, 2022. (Tr. 892-98.) She reported an increase in her anxiety and depression levels, noting she had been out of her medications for a week and could not get an appointment. (Tr. 897.) She reported that this increased her anxiety and depression and caused her to be irritable; she also described her focus and concentration as "bad." (*Id.*). She wanted to continue her medication regimen. (*Id.*) Her telephonic mental status examination noted depressed mood and impaired attention and concentration, but clear speech, logical thought processes, appropriate affect, and cooperative behavior. (Tr. 896.)

Ms. Stewart attended a telephonic medication management session with DNP Kornbau on November 4, 2022. (Tr. 919-27.) She reported anxiety due to back pain, but said her moods were stable; she was nervous due to a job interview that day. (Tr. 919.) Her mood was anxious, but her other mental status findings were normal. (Tr. 922-23.) DNP Kornbau did not make medication changes but encouraged therapy; Ms. Stewart was to return in four weeks. (Tr. 927.)

Ms. Stewart attended another telephonic medication management appointment with DNP Kornbau on December 2, 2022.  (Tr. 909-18.)  She reported doing "ok" but being stressed due to her 16- and 17-year-old children moving out; she had to call the police on her 17-year-old.  (Tr. 909.)  Her anxiety was the same as her prior visit, but Latuda was helping with her anger.  (*Id.*)  Her mood was depressed on examination, but her other mental status findings were normal.  (Tr. 912-13.)  DNP Kornbau again made no medication changes and encouraged therapy.  (Tr. 917.)

Ms. Stewart returned for telephonic medication management with CNP Louk on December 30, 2022.  (Tr. 899-907.)  She reported that her mood swings had been good that month except for one "rage" episode; she had "some" depression at 5/10.  (Tr. 899).  Her anxiety was at 8/10.  (*Id.*)  She denied suicidal ideation and self-harm and reported no hallucinations.  (*Id.*)  On examination, she was fully oriented with appropriate speech and affect, intact thought processes, normal memory, "managed" attention and concentration, and a euthymic mood.  (Tr. 902-03).  CNP Louk reported that Ms. Stewart was making progress towards her goals, made no medication changes, and continued to encourage therapy.  (Tr. 905-07.)

On January 18, 2023, LPCC-S Culp conducted an updated Adult Diagnostic Assessment of Ms. Stewart.  (Tr. 883-891.)  Ms. Stewart reported daily "low thoughts" and "fleeting suicidal thoughts," but denied intent or plan, saying her children would keep her from doing anything.  (Tr. 886, 888-89.)  Ms. Stewart rated her depression at 7/10 and said her medication was helping.  (Tr. 887.)  She described her anxiety as "576/10" with panic attacks triggered by certain driving conditions, too much noise, being alone, or being around too many people.  (Tr. 887-88.)  She also endorsed mood swings "several times a day when not on medication."  (Tr. 888.)  Ms. Stewart was neat and groomed with average eye contact and demeanor, logical thought processes, appropriate affect, good mood, and cooperative, pleasant, and calm behavior and

clear, rapid speech, but presented as agitated.  (Tr. 888-89.)  LPCC-S Culp observed that Ms.

Stewart struggled to focus, "bounc[ing] around from topic to topic within the same sentence."

(Tr. 888.)  LPCC Culp recommended continued CPST, medical services, and monthly

counseling that may include CBT, EMDR, and DBT therapy techniques.  (Tr. 891.)

### 2.    Opinion Evidence

#### i.    Consultative Examiner

Ms. Stewart presented to Kenneth Gruenfeld, Psy.D., for a consultative examination on

January 5, 2022.  (Tr. 616-22.)  She reported that she last worked at a gas station in June 2021,

where her mental health issues caused her to miss work, often work too slowly, and fail to carry

out or give up on job tasks.  (Tr. 617.)  She explained she could no longer work because:

> I don't want to go outside.  I don't like feeling like people are looking at me.  My
> anxiety turns into anger.  I am a very reactive person.

(*Id.*)

Ms. Stewart complained of mental health symptoms that included difficulty getting out of

bed and taking care of herself, sadness and low self-esteem, difficulty sleeping, racing thoughts,

lack of focus and motivation, anhedonia, and anger issues.  (Tr. 618.)  She said she attempted

suicide three times, most recently in 2002.  (*Id.*)  She also complained of anger problems, saying

she could not control her reactions or feelings, and reported a history of heart attacks, anxiety

attacks, and panic attacks.  (*Id.*)  Her panic attacks typically lasted 15 to 60 minutes and were

characterized by chest pain, increased heart rate, shaking, crying, vomiting, racing thoughts, and

shortness of breath.  (*Id.*)  She also complained of ongoing nightmares, flashbacks, and

hypervigilance.  (*Id.*)  She was often nervous and worried throughout the day, especially when

she left her home.  (*Id.*)  She reported that she rarely socialized with others.  (*Id.*)  She woke up

her children every day, then just sat in bed because it was "the only place where [she didn't]

11

hurt." (*Id*.)  Ms. Stewart said she cognitively knew how to complete household chores such as cooking or laundry, but due to her mental illness, she did not consistently help with household chores.  (Tr. 618-19.)

During the evaluation, Ms. Stewart was alert, well groomed, and maintained appropriate hygiene, but had problems sitting still in her chair, shook a lot in her chair and rocked back and forth and cried.  (Tr. 619.)  She answered all examiner questions, consistently remained on topic, elaborated when requested, and did not need questions repeated, but "had a very anxious tone to her voice." (*Id*.)  She did not endorse suicidal or homicidal thoughts, but her affect and mood were depressed and anxious and she "appeared very anxious during the evaluation and rocked back and forth in her chair." (*Id*.)  She did not exhibit or endorse symptoms of a psychotic condition such as hallucinations, loosening of association, or delusional thinking.  (*Id*.)  She was fully oriented, exhibited good concentration, maintained good eye contact, recalled 3 of 3 simple objects, completed serial 7 subtraction, and recalled four digits forward and three digits backward.  (*Id*.)  As to her insight and judgement, she was able to identify her medical issues, was aware she suffered from depression and anxiety, and was able to describe her treatment and symptoms and how they affected her life.  (*Id*.)

Dr. Gruenfeld diagnosed Ms. Stewart with moderate major depressive disorder and PTSD.  (Tr. 621.)  He noted that her physical health issues and gunshot wound contributed to her anxiety and depression, and that her mental health issues persisted despite ongoing treatment.  (Tr. 620.)  Based on her reported history of work performance and the current manifestation of her mental health issues, Dr. Gruenfeld stated that she would have "significant problems carrying out any job tasks with any degree of consistency." (*Id*.)

12

Dr. Gruenfeld provided a functional assessment of Ms. Stewart's mental abilities in the four categories of mental functioning, as follows. (*Id.*) With respect to understanding, remembering, and carrying out instructions, he opined that Ms. Stewart would have "significant problems carrying out instructions with any degree of consistency" since she "presented with severe anxiety" and "reported problems with focus and motivation." (*Id.*) With respect to maintaining attention, concentration, persistence, and pace, Dr. Gruenfeld opined that Ms. Stewart would "work slower than others and give up on job tasks even if the job tasks are simple in nature "[g]iven the above." (*Id.*) With respect to responding appropriately to supervision and coworkers in a work setting, Dr. Gruenfeld opined that Ms. Stewart would not "be able to effectively work with others when her anxiety is triggered" because she "presented as severely anxious." (*Id.*) With respect to responding appropriately to work pressures, Dr. Gruenfeld opined that Ms. Stewart did not "appear capable of managing job stress at this time." (*Id.*)

### ii.     State Agency Medical Consultants

On January 20, 2022, non-examining state agency medical consultant Paul Tangeman, Ph.D., completed a Mental RFC Assessment of Ms. Stewart. (Tr. 68-70, 79-81.) Dr. Tangeman opined that Ms. Stewart had no significant understanding and memory limitations, moderate limitations in sustained concentration and persistence, moderate to marked limitations in her ability to have social interactions, and moderate adaptation limitations. (Tr. 68-69, 79-80.) He further opined Ms. Stewart had the mental RFC to: carry out one to two step commands with adequate persistence and patience; interact with others superficially; and adapt to a static setting without frequent changes. (Tr. 69, 80.)

On May 24, 2022, state agency psychological consultant Irma Johnston, Psy.D., affirmed Dr. Tangeman's determinations but added the restrictions that Ms. Stewart could adapt to static

settings where there were no demands for a fast pace and could interact superficially with others away from the public.  (Tr. 92.)

## C.  Function Report

Ms. Stewart completed an Adult Function Report on November 4, 2021.  (Tr. 256-74.) She reported living with family and being limited from work due to pain and numbness in her legs, debilitating anxiety, and fears related to having been shot with a gun.  (Tr. 256.)

With respect to activities of daily living, Ms. Stewart reported attending to her children, home, and hygiene with significant limitations.  (Tr. 257.)  She could generally use the bathroom alone, depending on pain levels.  (*Id*.)  She stated she "live[d] in pajamas," only bathed if she had to go somewhere, had not shaved in over a year, and mostly ate snacks.  (*Id*.)  She would occasionally make dinner but only did so weekly, making simple meals like sandwiches.  (Tr. 257-58.)  She could not prepare meals more often because she could not stand long enough to do so and had severe neuropathy in her hands.  (Tr. 258.)  She reported that it took 30 minutes to two hours to prepare the food.  (*Id*.)  The only other household chore she reported herself able to complete was cleaning the toilet with Clorox wipes.  (*Id*.)  She explained she could not do more tasks because her hands would go numb and her thumbs would "lock" or her legs would go numb, causing her to fall.  (*Id*.)  Her children helped with cooking and cleaning.  (Tr. 257.)

With respect to caring for her children, Ms. Stewart stated she would cuddle with her nine-year-old child.  (*Id*.)  Otherwise, her 16-year-old son helped his younger siblings wake up for school, and Ms. Stewart "mainly just deal[t] with phone calls."  (*Id*.)  Ms. Stewart's case manager helped her make appointments and set up transportation.  (*Id*.)  Ms. Stewart needed reminders from her sons to care for her personal hygiene and take medications.  (Tr. 258.)

Before her illness or injury, Ms. Stewart said she could drive, take walks, grocery shop, attend school functions, take her children places, and "work happily." (Tr. 257.)

Ms. Stewart reported she "rarely" went outside; she only went out for doctor's appointments and occasional grocery shopping. (Tr. 259.) She could not leave her house alone because she felt paranoid and would disassociate. (*Id.*) Ms. Stewart did not drive because the last time she drove, a truck rolled on the freeway in front of her. (*Id.*) She completed necessary shopping in stores and by phone. (*Id.*)

Ms. Stewart was able to pay bills, count change, handle a savings account, and use a checkbook / make a money order. (*Id.*) Her hobbies and interests included reading, gardening, walking, and Xbox, but she no longer engaged in any of these activities. (Tr. 260.) She reported experiencing too much pain to garden or walk and being unable to concentrate long enough to read or play Xbox. (*Id.*) Ms. Stewart spent time with others by texting, explaining that she would lose her train of thought while talking. (*Id.*) She did not go anywhere regularly, except to counseling every other week. (*Id.*) She needed others to remind her of plans and to accompany her when she left the house in case she fell or experienced an anxiety or heart attack. (*Id.*) Her only regular social interactions were visits with her case manager and case worker. (*Id.*)

Ms. Stewart said she was limited by her conditions in all specified areas, except for talking and hearing. (Tr. 261.) She was right-handed. (*Id.*) She could walk 20 to 30 feet before needing to rest for an indeterminate amount of time depending on her pain levels. (*Id.*) She sometimes finished what she started, needed to read written instructions three times because she mixed up words, and struggled to pay attention to spoken instructions. (*Id.*) She reported handling stress by going to bed and crying and said she did not handle changes in routine "at all." (Tr. 262.)

15

**D.      Hearing Testimony**

**1.      Plaintiff's Testimony**

At her March 15, 2023 administrative hearing, Ms. Stewart testified in response to questioning by the ALJ.  (Tr. 31-58.)  She said she lived with her husband and four children, ages 11, 15, 16, and 17. (Tr. 38.)  She had a driver's license with no medical restrictions other than corrective lenses.  (Tr. 39.)  She said she did not drive because it terrified her and caused anxiety attacks.  (*Id.*)  Her husband would take her to the doctor or the store, or she would use Medicaid Ride.  (Tr. 39-40.)  She said using the bus was difficult because the nearest bus stop was three blocks from her house and walking there was a challenge.  (*Id.*)

Ms. Stewart testified she had not worked since June or July of 2021, but noted she had completed four-hour training shifts at Rite-Aid and at Sally Beauty Supply.  (*Id.*)  She confirmed that her last extended period of employment was at a gas station for two years; she worked as the assistant manager for the last eight months of that time.  (*Id.*)  From 2015 to 2017, she worked full time as a head baker.  (Tr. 41.)  During the hearing, Ms. Stewart told the ALJ that she was having a panic attack.  (*Id.*)  The ALJ offered to take a break, but Ms. Stewart said she was "ok" and continued to testify.  (Tr. 43-44.)

Regarding her psychological conditions, Ms. Stewart testified that she did not "do well with other people."  (Tr. 52.)  Although she did not feel she could be alone, she said being with other people caused her anxiety to become "out of control."  (*Id.*)  She reported experiencing anxiety attacks that caused her to pass out or that she believed were heart attacks.  (*Id.*)  She experienced anxiety around even one person she did not know or around large groups of people.  (Tr. 54.)  She once attended a family birthday party of about 20 people and spent most of the party in the kitchen because "it was just too much" for her.  (*Id.*)

Ms. Stewart said she also experienced flashbacks of a January 2021 incident during which she was shot in the leg at her home.  (Tr. 53.)  She could not "deal with loud noises" and always wondered if strangers were the person who shot her.  (*Id.*)

Ms. Stewart testified that she only left her house to go to the doctor and to go to the grocery store once a month.  (*Id.*)  She attended three or four doctor's appointments every month with two of her sons, who have special needs.  (Tr. 53-54.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified.  (Tr. 55-58.)  The VE classified Ms. Stewart's past relevant work as: baker, DOT code 526.381-010, exertional level heavy, with an SVP of 7; and cashier checker, DOS code 211.462-014, exertional level light, with an SVP of 3.  (Tr. 56.) The VE opined that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could not perform Ms. Stewart's past relevant work, but could perform representative positions in the national economy, including small parts assembler, inspector and hand packager, or mail clerk.  (Tr. 56-57.)  If the hypothetical individual needed to be in an essentially isolated environment with no contact or interactions with coworkers, the VE opined that there would be no competitive work available. (*Id.*)  The VE also stated that an individual could remain off task ten percent of the workday and be absent one day per month and remain gainfully employed.  (Tr. 57-58.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v.*

---

[2] The DIB and SSI regulations are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his April 26, 2023 decision, the ALJ made the following findings:[3]

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.  (Tr. 16.)

2.   The claimant has not engaged in substantial gainful activity since May 7, 2021, the alleged onset date.  (*Id.*)

3.   The claimant has the following severe impairments: obesity, diabetes mellitus type II, neuropathy, bilateral occipital neuralgia and trapezius muscle spasm, hidradenitis suppurativa, degenerative disc disease of the lumbar spine, cardiomegaly, tortuous ectatic aorta, atherosclerotic disease, major depressive disorder/bipolar disorder, anxiety disorder, posttraumatic stress disorder (PTSD), and borderline personality disorder.  (Tr. 17.)

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.   The claimant has the residual functional capacity to perform light work except occasional climbing ladders, ropes, and scaffolds; frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; superficial interaction with coworkers; no interaction with the general public; can attend to and carry out routine instructions; limited to one to two step instructions with adequate persistence and pace; and must work in a static setting without frequent workplace changes.  (Tr. 20.)

6.   The claimant is unable to perform any past relevant work.  (Tr. 24.)

7.   The claimant was born on January 19, 1979 and was 42 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.   The claimant has at least a high school education.  (*Id.*)

9.   Transferability of job skills is not material to the determination of disability.  (*Id.*)

---

[3] The ALJ's findings are summarized.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including small parts assembler, inspector/hand packager, and mail clerk.  (Tr. 24-25.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 7, 2021, the alleged onset date, through the date of the decision, April 26, 2023.  (Tr. 25.)

### V.      Plaintiff's Arguments

In her sole assignment of error, Ms. Stewart argues that the ALJ's mental RFC determination is unsupported by substantial evidence because the ALJ failed to properly evaluate consultative examiner Dr. Gruenfeld's opinion.  (ECF Doc. 12, p. 10.)

### VI.      Law & Analysis

#### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**A.    Sole Assignment of Error: Whether the ALJ Failed to Properly Evaluate the Medical Opinion of Consultative Psychological Examiner Dr. Gruenfeld**

Ms. Stewart argues that the RFC lacked the support of substantial evidence because the ALJ failed to properly evaluate the medical opinion of consultative psychological examiner Dr.

21

Gruenfeld.  (ECF Doc. 12, pp. 10-16; ECF Doc. 15.)  The Commissioner responds that the ALJ's

evaluation of Dr. Gruenfeld's report was supported by substantial evidence.  (ECF Doc. 14, p. 9.)

### 1.    Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion

evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors

listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones*

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

The five factors to be considered are supportability, consistency, relationship with the claimant,

specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must

explain how they considered consistency and supportability, but need not explain how they

considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings

and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or

prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words,

"consistency" is the extent to which a medical source's opinion findings are consistent with the

evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence. *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

## 2. The ALJ Failed to Consider the Entire Record and Adequately Articulate His Reasons for Finding Dr. Gruenfeld's Opinion "Unpersuasive"

The ALJ found Dr. Gruenfeld's opinion to be "unpersuasive," explaining:

> Dr. Gruenfeld determined that the claimant would have significant problems carrying out instructions with any degree of consistency, she would work slower than others even if performing simple tasks, she could not effectively work with others, and could not manage job stress. These opinions are inconsistent with the medical record as a whole, including the claimant's positive response to her psychotropic medications and counseling sessions, without evidence of psychiatric hospitalization in the record, and her mostly unremarkable reported symptoms to providers and other sources such as Dr. Gruenfeld, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues (Exhibit B7F; B10F; B15F). Moreover, these opinions were largely based on claimant's subjective allegations, which are not fully consistent with the record for the reasons stated above.

(Tr. 23 (emphasis added).)  Thus, to support his persuasiveness finding, the ALJ asserted that the whole record, including Dr. Gruenfeld's report, shows: (1) a "positive response to . . . psychotropic medications and counseling sessions"; (2) a lack of "evidence of psychiatric hospitalization"; (3) "mostly unremarkable reported symptoms to providers and other sources such as Dr. Gruenfeld"; and (4) a lack of "evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues." (Tr. 23.)  The ALJ also found Dr. Gruenfeld's opinion was "largely based on claimant's subjective allegations, which are not fully consistent with the record."  (*Id.*)  In support of these

23

findings, the ALJ did not make specific citations to the record; instead, he cited generally to Dr. Gruenfeld's report and over 200 pages of psychiatric treatment records that detailed Plaintiff's treatment from May 2020 through January 2023.  (*Id.* (citing Tr. 616-22, 653-756, 868-967).)

Ms. Stewart argues that the ALJ's analysis fails to "build a logical bridge between the evidence and the result" because he does not cite specific evidence to support his findings, and that his findings also mischaracterize the medical records.  (ECF Doc. 12, pp. 13-15.)  More specifically, Ms. Stewart argues that the record is inconsistent with the ALJ's findings: that Dr. Gruenfeld's opinion is "largely based on . . . subjective allegations"; that Ms. Stewart reported "mostly unremarkable . . . symptoms to providers and . . . Dr. Gruenfeld; and that the record lacks "evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues." (*Id.*)  In response, the Commissioner argues that the ALJ sufficiently articulated his findings; he also identifies specific medical records that could support the ALJ's findings.  (ECF Doc. 14, pp. 10-11.)  But Ms. Stewart asserts that the Commissioner's explanations and citations are inadmissible post hoc rationalizations that merely highlight the ALJ's own failure to provide adequate explanation for his findings in the underlying ALJ decision.  (ECF Doc. 15.)

"'It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  *Allen v. Berryhill*, 273 F. Supp. 3d 763, 774 (M.D. Tenn. 2017) (quoting *Berryhill v. Shalala*, 4 F.3d 993 (Table), 1993 WL 361792, at *6 (6th Cir. Sept. 16, 1993) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983))); *see Foltz obo R.B.K.F. v. Comm'r of Soc. Sec.*, No. 23-3362, 2023 WL 7391701, at *4 (6th Cir. Nov. 8, 2023).  Thus, this Court "may not accept appellate counsel's post hoc rationalizations for agency action."  *Allen*, 273 F. Supp. 3d at 774 (internal quotations omitted);

*see Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (6th Cir. 1991) (citations omitted).  Further, it is not this Court's role "to scour the record for evidence . . . which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it."  *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) (emphasis in original).

Nevertheless, an ALJ may rely on information articulated earlier in his decision to support a finding and need not rearticulate the information in his later analysis.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").  And an ALJ need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).

Thus, the question becomes whether the ALJ's written decision sufficiently shows that he considered the complete evidentiary record, reached a reasoned conclusion on the basis of the record, and adequately articulated the grounds for his findings.  For the reasons explained below, the undersigned concludes that the ALJ's written decision does not clearly demonstrate that he considered the entire record and adequately articulated the basis for his findings.

Although the complete medical record shows that Ms. Stewart attended monthly psychiatric medication management visits before and throughout the relevant period, the ALJ

limits his discussion of her mental health treatment to two medication management visits and one diagnostic assessment. In discussing the Listings at Step Three of the sequential analysis, the ALJ briefly discusses Ms. Stewart's mental status findings at a June 2022 appointment (Tr. 19 (citing Tr. 961)) and discusses her symptom reports and mental status findings at a diagnostic assessment in January 2023 (*id.* (citing Tr. 888-89)). In his Step Four RFC analysis, the ALJ again discusses the January 2023 assessment (Tr. 22 (citing Tr. 883, 888-90)), in addition to complaints and mental status findings from a treatment visit in February 2022 (*id.* (citing Tr. 743, 747, 750)). Although the ALJ outlines Dr. Gruenfeld's opinions, he does not summarize or discuss any of the objective examination findings in Dr. Gruenfeld's report. (Tr. 23.) Following this limited discussion of the mental health treatment records, the ALJ makes the following findings regarding Ms. Stewart's mental health complaints:

> Regarding the consistency of the claimant's mental health allegations, <u>she admitted seeing a positive response to her psychotropic medications and counseling sessions</u>, without significant side effects, and there is no evidence of psychiatric hospitalization in the record. Additionally, <u>the claimant reported mostly mild to moderate level symptoms to providers</u> at Comprehensive Behavioral and other sources, <u>and during her psychological consultative examination</u> with Dr. Gruenfeld, <u>without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues</u> (Exhibit B7F; B10F; B15F). Thus, there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above.

(Tr. 22-23 (emphasis added).)

Thus, parallel to his opinion analysis, the ALJ cited generally to Dr. Gruenfeld's report and over 200 pages of treatment records to support general statements that Ms. Stewart: "admitted seeing a positive response" to treatment; "reported mostly mild to moderate level symptoms to providers . . . and during her psychological consultative examination"; and that the record lacked "evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues." (*Id.*)

Given the ALJ's limited discussion of specific records and failure to identify the records that support his general findings, the undersigned turns to whether the ALJ's generalizations can support a finding that he both reviewed and reasonably considered the complete record.

Looking first at the ALJ's findings that the medical records show Ms. Stewart's "positive response to her psychotropic medications and counseling sessions" and "mostly unremarkable reported symptoms" (Tr. 23) or "mostly mild to moderate level symptoms" (Tr. 22), it is not clear from the ALJ's decision what records he relied on to support these findings.  Possibly he relied on the February 2022 treatment visit where he noted that Ms. Stewart said she was doing "alright" and that there were "no recent changes in her mental health symptoms" (*id*. (citing Tr. 743)) or the January 2023 diagnostic assessment where he noted that she endorsed mood swings several times a day when not on medicine (*id.* (citing Tr. 888)).  But in stating that Ms. Stewart reported "mostly unremarkable" or "mild to moderate level" symptoms to her providers and Dr. Gruenfeld, the ALJ did not acknowledge the many treatment visits where Ms. Stewart reported severe anxiety, feeling overwhelmed and hopeless, or suffering nightmares, night terrors, daily panic attacks, hallucinations, suicidal thoughts, and/or frequent mood swings despite medications.[4]  (*See, e.g.,* Tr. 663, 670, 708, 710, 723, 736, 737, 739, 741, 753, 887-88, 928, 938, 948, 957, 966.)  He also did not acknowledge Ms. Stewart's reports to Dr. Gruenfeld that she had difficulty getting out of bed and suffered panic attacks, nightmares, flashbacks, and hypervigilance.  (Tr. 618).  And in finding Ms. Stewart showed a "positive response" to treatment, the ALJ did not address Ms. Stewart's continued reports of serious symptoms despite treatment, as discussed above, or the treatment visits where Ms. Stewart specifically complained of high anxiety that was not controlled by her medications.  (*See, e.g.,* Tr. 736, 753, 966.)

---

[4] The ALJ did acknowledge one visit where Ms. Danyell complained of "fleeting" daily suicidal thoughts (Tr. 19 (citing Tr. 888)), but not another visit where she reported thinking of suicide "all the time" (Tr. 723).

Looking next at the ALJ's finding that there is no "evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues" (Tr. 23), it is again not clear from the ALJ's written decision what specific records he relies on to support this finding.  He did observe there was no evidence of hallucinations or delusions at her January 2023 diagnostic assessment.  (Tr. 19 (citing Tr. 888-89), Tr. 22 (same).) And while he said "there were hallucinations or delusions present" at her February 2022 visit (Tr. 22), this appears to be a typographical error, since no hallucinations were noted at that appointment (Tr. 747).  But the ALJ does not address other treatment visits where Ms. Stewart reported hallucinations and/or hearing voices.  (*See, e.g.,* Tr. 663, 723.)  He acknowledges one report of daily "fleeting" suicidal thoughts (Tr. 19 (citing Tr. 888-89)) but does not acknowledge an earlier report that she thought about suicide "all the time" (Tr. 723) or the fact that she reported daily fleeting suicidal thoughts on more than one occasion (Tr. 670, 888-89).

Further, while the ALJ generally asserts that there is no evidence of "other serious issues," he does not acknowledge abnormal mental status examination findings throughout the medical records that reflect not only anxiety and depression but agitation, tearfulness, tangential thought processes, increased rate and volume of speech, a need for redirection, bouncing from topic to topic, and impaired attention and concentration.  (*See, e.g.,* Tr. 663, 707, 708, 731, 736, 739, 747, 753, 888-89, 896, 966.)  He also does not discuss any of Dr. Gruenfeld's mental status findings, including his observations that Ms. Stewart appeared "very anxious," had a "very anxious tone to her voice," had trouble sitting in her chair, shook a lot in her chair, rocked back and forth in her chair, and cried during her consultative examination.  (Tr. 619.)  Having not discussed any of the above objective findings, the ALJ likewise failed to explain how or why he concluded that such findings do not constitute evidence of "other serious issues."

28

Finally, looking at the ALJ's conclusion that Dr. Gruenfeld's opinion was "largely based on the claimant's subjective allegations" (Tr. 23), the ALJ does not summarize or provide any analysis of Dr. Gruenfeld's report to support or explain this conclusory finding.  Although the Commissioner has identified some findings in Dr. Gruenfeld's report that could support a finding that he relied in part on Ms. Stewart's subjective complaints (ECF Doc. 14, p. 13), the ALJ did not provide similar citations or offer similar explanations in his written decision.  The ALJ also did not acknowledge or address the fact that Dr. Gruenfeld noted specific abnormal objective observations in his examination report—including a very anxious tone of voice, crying, shaking in her chair, and rocking back and forth in her chair—and then explicitly stated that his opinions regarding her functioning in the areas of understanding, remembering, and carrying out instructions and responding appropriately to supervision and coworkers were based, at least in part, on the fact that she "presented with severe anxiety" and "presented as severely anxious." (Tr. 619-20.)  Regardless of whether it might be possible for the ALJ to reasonably conclude that Dr. Gruenfeld's opinion was "largely based on . . . subjective allegations," the ALJ failed to clearly demonstrate that his finding was based on a reasoned consideration of Dr. Gruenfeld's entire report and failed to adequately articulate the basis for his finding.

Because the ALJ did not clearly identify or discuss which records support his findings, did not acknowledge the many records that appear inconsistent with his findings, and did not explain why his findings remain appropriate despite those inconsistent records, the undersigned concludes that the ALJ did not clearly consider the entire record or adequately articulate his basis for finding that Ms. Stewart demonstrated a positive response to treatment, reported "mostly unremarkable" symptoms, and presented no evidence of "serious issues," or for finding that Dr. Gruenfeld based his opinion "largely" on subjective allegations.  Therefore, the undersigned

concludes that the ALJ inadequately articulated his analysis of Dr. Gruenfeld's medical opinion and failed to build "an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877; *see id.* at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.") (citations omitted).

For the reasons set forth above, the undersigned concludes that the ALJ committed reversible error and failed to build a logical bridge between the evidence and the result when he inadequately articulated his grounds for finding Dr. Gruenfeld's medical opinion unpersuasive. Accordingly, the undersigned finds Ms. Stewart's assignment of error to be well-taken.

## VII.    Recommendation

For the reasons set forth above, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

On remand, the ALJ should consider the entire medical record and provide a clear, accurate, and well-reasoned explanation to support his findings regarding the persuasiveness of all medical opinion evidence, including the medical opinion of consultative psychological examiner Kenneth Gruenfeld, Psy.D.

January 16, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).